

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO

ANDREW JAMES ENSOR, **per se**

Plaintiff,

vs.

FITNESS INTERNATIONAL, LLC. AKA:
OWNER: LA FITNESS, FLORIDA:
FEI Number:33-0774939 FL: Bus Lic:86534
PERSON(S), CORPORATE OFFICER(S),
INCORPORATE ENTITIES or
EMPLOYEE(S): A-THROUGH-Z;
ASSIGNED BY DISCOVERY:

Defendant(s)

Case No._____

# COMPLAINT

# JURY TRIAL DEMANDED

## STATEMENT OF CLAIM.

Plaintiff holds domicile in City of Orlando, Orange County, Florida; and brings this Complaint on behalf of himself, per se, as a victim of two counts of **Criminal and or Culpable Negligence** ostensibly perpetrated by Defendant(s) whose diverse citizenship is the State of California. In each count plaintiff seeks relief for pain, suffering, disfigurement and violations of both Federal and State Law(s). In addition, Plaintiff charges multiple count(s) of **failure to supervise, failure to train, failure to do all lawful diligence**; in violation(s) Federal and State Law(s) for said **Negligence** and **Expectation of Privacy** as originally decided by: <u>Katz v. United States 389 U.S. 347</u> (1967); Said Defendant Actor(s) "A THROUGH Z" are before the court as Individuals or Entities unknown except by discovery; who aided and abetted, directed, failed to supervise, failed to properly train, failed to do all lawful diligence(s) and or are Identified herein as **Respondent(s) Superior(s)** as defined: See Delaurentos v. Peguero, <u>47 So.3d 879, 880-82</u> (Fla. 4th DCA 2010) see also: Buckler v. Israel, <u>680 Fed.Appx. 831, 834</u> (11th Cir. 2017) see; United States v. DeCoster, <u>828 F.3d 626 (2016)</u>. **[Citation Index Attached]** Plaintiff requests relief by jury trial for

35  Defendant(s)' victimization by criminal breach of lawful duty. Plaintiff will petition
36  the Federal District for punitive damages, on each count of criminal negligence herein
37  charged, and; on count(s) violating expectation privacy; Plaintiff complains
38  Defendant(s) establish an interstate aka national policy to violate Federal and State
39  law(s) and will petition for damages in each count; and relief from each said secondary
40  actor(s) and said respondent(s) superior. Additionally, plaintiff will motion for order
41  of the court for good, reasonable and lawful cause(s), directing the revocation in
42  perpetuity of the commercial business license(s) of defendant(s) deny them any
43  capacity to operate or participate in the supervision of any business or hold any interest
44  in or with, or in association with any real person(s), proxy, and or corporate entity
45  doing the same anywhere within the venue of the State of Florida in perpetuity;
46  specifying that no reapplication for commercial operation(s) may commence without
47  a motion granted by this court to vacate said order. Defendant(s) are before the court
48  because they cannot be trusted to obey the laws of the United States or the State of
49  Florida.

50  **I.    The Parties to This Complaint**
51
52  **A.    PLAINTIFF**
53  Andrew James Ensor
54  2328 Conway Rd., Suite: O
55  Orlando, Orange County
56  Florida, 32812 USA
57  314.882.0551
58  AJEnsr @ aol.com
59
60  Andrew James Ensor, aka: AJ Ensor; established domicile in said city and
61  county in June 2016. By the standards and protocols of the U.S. Federal Social
62  Security Administration and by his personal historical medical record(s) he is,
63  DISABLED.
64
65  **B.    Defendant(s)**
66  1. FITNESS INTERNATIONAL, LLC. aka: OWNER: LA FITNESS; aka:
67  Esporta Fitness;
68  FLORIDA COMMERCIAL LICENSE: Number: 86534
69  FL FEI Number: 33-0774939

| 70 | 3161 MICHELSON DR. |
| 71 | STE. 600 |
| 72 | IRVINE, CA 92612 USA |
| 73 | **Robert Wilson**, GeneralCounsel@LAFitness.com |
| 74 | S Vice President, General Counsel at Fitness International, LLC |
| 75 | 949-255-7223 |
| 76 | Address same |
| 77 | **Doug Kim** |
| 78 | Vice President, Corporate Counsel at Fitness International, LLC |
| 79 | Address same |
| 80 | |
| 81 | b. Florida Agent of Record |
| 82 | C T CORPORATION SYSTEM |
| 83 | 1200 SOUTH PINE ISLAND ROAD |
| 84 | PLANTATION, FL 33324 US |
| 85 | |
| 86 | **2.** FITNESS INTERNATIONAL, LLC. AKA: |
| 87 | LA FITNESS, FLORIDA: AKA: ESPORTA FITNESS; |
| 88 | PERSON(S), CORPORATE OFFICER(S), |
| 89 | INCORPORATE ENTITIES or EMPLOYEE(S): A THROUGH Z |
| 90 | DISCOVERY PENDING |
| 91 | Address: |
| 92 | C T CORPORATION SYSTEM |
| 93 | 1200 SOUTH PINE ISLAND ROAD |
| 94 | PLANTATION, FL 33324 US |
| 95 | (954) 473-5503 |

96 **II. Jurisdiction**

97 1. This Complaint is before the Federal District Court under **28 U.S.C. §1331,**

98 **28 U.S.C. §1491** as an issue(s) arising from Federal Law(s), and;

99 U.S. 14th Amendment: Expectation of privacy: **42 U.S.C. §1983**

100
101 o 42 U.S.C. §1983 provides that any person who, under color of any statute,
102 ordinance, regulation, custom, or usage, of any State, subjects, or causes to be
103 subjected, any citizen of the United States or other person within the jurisdiction
104 thereof to the deprivation of any rights, privileges, or immunities secured by the
105 Constitution and laws, shall be liable to the party injured.

106 2. **29 U.S.C. §654**
107 In essence, this clause requires employers to provide a safe working
108 environment, even in the absence of specific standards or regulations from the
109 Occupational Safety and Health Administration (OSHA)

110  2.(b) **Florida §442.007** Safety; employer responsibilities.--Every employer as
111  defined in §440.02 shall furnish employment that is safe for the employees
112  therein, furnish and use safety devices and safeguards, adopt and use methods
113  and processes reasonably adequate to render such an employment and place of
114  employment safe, and do every other thing reasonably necessary to protect the
115  lives, health, and safety of such employees.

116  3.    This Complaint is also before the court under **28 U.S.C.§1332**, as a

117        matter arising from the diversity of citizenship, in this case the State of

118        Florida and the State of California in a matter that exceeds $75,000.00.

119

120  **III:   BACKGROUND:**

121  PLAINTIFF:

122        Andrew James Ensor, aka AJ Ensor; established domicile in Orlando

123        Florida in June of 2016, and whose current address at time of this filing is: 2328

124        Conway Rd., Suite: O, Orlando FL 32812 USA. Ensor worked as a media

125        producer until COVID, arthritis and diabetes disabled him. In reviewing this

126        case the plaintiff asks respectfully that the court recognized that he is a complete

127        rank amateur when it comes to issues arising in the law. Plaintiff has never been

128        before any court on an issue arising at law in his lifetime and in the State of

129        Florida he is now considered a senior. Everything the court reads in this

130        complaint is the result of Plaintiff watching way too many "How To" YouTube

131        videos. That is all the technical law expertise plaintiff possesses.

132

133  DEFENDANT(s):

134        Fitness International LLC – Overview Description

135        Allegedly: Fitness International is a private company headquartered in

136        California with an estimated number of more than 10,000 employees. In the

137        US, the company has a notable market share in at least two industries: Health

138        & Fitness Clubs and Arts, Entertainment and Recreation. Their largest market

139 share is in the Gym, Health & Fitness Clubs industry, where they account for
140 an estimated 5.5% of total industry revenue.

141 SEE: IBISWorld dot com

142 Registered Commercial License Name: Fitness International LLC

143 FLORIDA FEI Number: <u>33-0774939</u>, FL: Bus Lic:<u>86534</u>

144

145 Headquarters: 3161 Michelson Dr, Irvine, CA 92612

146 Website: https://www.lafitness.com/Pages/Default.aspx

147 Employees: 10000+

148 LA Fitness's revenue is $2.1 billion (2023) SEE: Zippia dot com

149 Allegedly; at its core fitness international is a sales organization. The company
150 is made up of current or former sales personnel from various industries who
151 establish annual target revenue quotas and then proceed to meet those targets,
152 theoretically, without violating any laws along the way. There is no reason for
153 anyone to believe that this company wants to do something other than satisfy
154 its clientele and make money. Still, if those sales quotas fall short of targeted
155 expectations, then so to expectations of continued employment would allegedly
156 also fall equally short. The bottom-line annual return is what defines this
157 company's success and always will because that is priority #1. Said Defendant
158 Actor(s) "A THROUGH Z" are before the court as Individuals or Entities
159 unknown except by discovery and they are in charge of this company.

160

161 **IV:** **COMPLAINT:**

162     <u>**Count 1**</u>

163 1.    Due to medical condition(s) plaintiff is a frequent almost a daily visitor to the
164 LA Fitness health club at the corner of Michigan and Conway roads in Orlando FL:
165 *4550 E Michigan St, Orlando, FL 32812.* It is within walking distance of his home.
166 Plaintiff has been trained, for medical reasons, to execute a daily regimen of physical
167 therapy. Originally LA Fitness membership enrollment was in Stuart, Florida. Plaintiff

168  has been a member of LA Fitness since November 2010. Sometime around the year
169  2020 (possibly later) the cost associated with attending the club was taken over by
170  plaintiffs' health insurance. Before that time, it was a different membership. Around
171  the year 2019, said health club location name was changed from LA Fitness to Esporta
172  Fitness. Allegedly as part of a marketing campaign. On Saturday afternoon,
173  **September 9th, 2023**, plaintiff entered said club as he usually does and witnessed
174  nothing exceptional or out of the ordinary. There were few people in the club. The
175  pool area was in full view because of windows [SEE: NOTE(s) attached 16 Aug'24;
176  pg #16] and there was no one inside the pool area. Based on years of experience; when
177  a pool maintenance crew is active there is a uniformed pool company employee inside
178  the pool area and a maintenance truck parked outside. On this day, Plaintiff witnessed
179  no maintenance truck on the way in, or anyone engaged in any maintenance inside
180  the pool area. There were no signs posted anywhere regarding the pool, as can often
181  be seen in front of the Hot Tub or on the front desk while walking in a Large Bold Face
182  Sign: "POOL CLOSED, or, "HOT TUB CLOSED;" and there was no yellow tape
183  blocking access to any of the pools. As always, on the way in, plaintiff checks to see if
184  the hot tub is working. At this location it is just as likely not to be working, and it is
185  always a surprise to see it operational. Defendants' ability to provide effective
186  maintenance at this location, as compared to their other locations, has always been
187  problematic. The reasons have never been clear. There are always plenty of excuses
188  but no obvious reason as to why Defendant(s) have so many problems with basic
189  maintenance, including but not limited to, keeping the pool(s) clean. On said day,
190  Plaintiff entered the club and began his usual routine. This involved executing various
191  types of exercises by way of weight machines and cycling through them as part of a
192  well-practiced, low impact regiment, followed by up to three different aerobic
193  exercises. Once complete plaintiff entered the men's locker room and disrobed except
194  for athletic shorts and proceeded to the men's sauna. There was no one in the locker
195  room. After about 10 minutes he shaved and proceeded into the pool area. The pool
196  area almost always smells of chlorine. It is one of the defining characteristics of the

197  room. As an original matter upon entering the pool area the plaintiff detected nothing
198  particularly unusual about the chlorine odor present. There was nothing present to
199  alert the plaintiff as to any hazards or warnings, and or, advisories. Most of the clubs
200  in the Orlando area use yellow tape when any part of the pool area is shut down for
201  good cause. Since 2016, plaintiff has witnessed this protocol at the Michigan street
202  location maybe a half dozen times. But not at all since the end of COVID pandemic.
203  The point is that there was nothing present that gave Plaintiff any warning as to what
204  was about to happen. Had there been any warning then plaintiff would have reacted
205  as a reasonable person, the same way he always does when attending any LA Fitness
206  location, as any normal adult should; by putting safety first.  No rational person enters
207  a health club with intent to be harmed.

208  2.       Plaintiff entered the main swimming pool, aka lap pool, with ropes that define
209  the individual lap lanes. Plaintiff proceeded to do a half dozen swimming laps and
210  then executed a routine water physical therapy he was trained to do in a pool as
211  medical therapy. This is the usual daily, most common routine and these days it is all
212  done mostly for medical reasons because failing to do so can have painful physical
213  consequences including muscle spasms which is common among diabetics. Plaintiff
214  finished and then walked off to get into the hot tub. While the smell of chlorine is
215  always common in the pool area it is always the strongest when one approaches the
216  hot tub. On this day, there was nothing to suggest anything out of the ordinary. In fact,
217  the water was clear and clean. This is distinguished by the fact that usually, it is neither
218  clean nor clear. Based on years of observations; the lack of clear clean water is because
219  individual filters are only cleaned on every other maintenance cycle. They are not
220  cleaned every day, so the water foams up, and on top of the foam, floats various skin
221  cells from the previous occupants. This day it was crystal clear blue instead of green.
222  Plaintiff entered the hot tub and over the next 90 seconds slowly sat down into what
223  felt like a 103-degree water temperature. Which is normal. As Plaintiff's sat in the hot
224  water, approaching the estimated two-minute mark plaintiff noticed that there was
225  something very wrong with the level of chemicals present in the water because his eyes

226  began to burn. Plaintiff has years, decades even; of experienced at sensing any
227  abnormal odor and or intensity of that chemical odor(s) in pools having used them
228  most of his life and having own and operated one in his youth. Feeling very
229  uncomfortable, Plaintiff immediately, abruptly and aggressively moved out of the hot
230  tub and jumped into the big pool. Something that Plaintiff never does because said lap
231  pool is too shallow. There was a genuine sense of there being something very unusually
232  wrong and so Plaintiff ignored caution and jumped in. Plaintiff moved to the stairs at
233  the end of the pool area and lifted himself up out of the water. He examined himself
234  standing, looking over his arms and legs and saw nothing wrong. He entered the locker
235  room and looked into the mirror and his eyes were bloodshot, but his skin seemed
236  unaffected. Plaintiff then proceeded to the shower. He rinsed-off with the fresh water,
237  put his clothes back on, then proceeded out of the club. At the club entrance there were
238  no attendants. There was no one sitting at any of the desks. There was no Employees
239  of the club in sight. While this is unusual it is not unheard of on a Saturday afternoon,
240  particularly if there is only one attendant and they need to use the bathroom. Plaintiff
241  proceeded home. There was absolutely no sense of there being anything wrong
242  whatsoever on the walk home. Plaintiff usually walks home soaking wet which is one
243  of the advantages of being within walking distance of a health club. Arriving at home
244  Plaintiff proceeded to his own bathroom shower. He removed his clothes and noticed
245  almost immediately that his once solid black underwear was no longer black. The color
246  had been washed out by the chemicals in the hot tub. While Plaintiff found this to be
247  shocking, and had never witnessed it before, he still had no indication that there was
248  anything wrong with him. Then, plaintiff stepped into the shower, turned on the water,
249  and once the running water contacted his scrotum he was brought to his knees from
250  pain. All he could do was just kneel there and take it. The pain was sharp, intense,
251  nauseating and crippling and caused his eyes to tear up. Plaintiff has over his lifetime
252  experienced gout arthritis many times and has degenerative spinal disease. This pain
253  was worse than any gout he had ever experienced, and plaintiff was just a tiny bit
254  afraid of going into shock. After several minutes, Plaintiff lifting himself out of the

shower and moved to in front of the bathroom mirror. Lifting his scrotum up to see clearly in the mirror it was obvious that he had been burned. To control the blister that was forming on his testicle's plaintiff used a "Lance" to puncture and drain it. A Lance is a device commonly used among diabetics to draw blood. As circumstances would have it, the previous December, plaintiff had experienced a condition commonly referred to as "Shingles." Coincidentally, plaintiff remained in possession of all the medical cream from that event. Plaintiff also had life experience when dealing with burns. As a boy he was a lifeguard on the ocean and had to deal with them on almost a daily basis. So, he was able to treat himself. He did send off an electronic e-mail to his doctor, but it was the weekend, and they were closed. But they would see the note first thing Monday morning. Also, as a person with degenerative spinal disease Plaintiff was and still is in possession of a considerable quantity of narcotics. The reason for the quantity is because the Plaintiff genuinely dislikes using narcotics. Still, every Doctor Who has looked at his MRI's, and acting with good reasonable cause, has written him a prescription for narcotics. Plaintiff suffered terribly during the pandemic with COVID. For that reason, he was not interested in going near any emergency room unless his condition deteriorated. The critical thing was to prevent infection and control the pain. Thanks to previous good medical care he already possessed the required medicines including antibiotics. Once the blister had been drained and the pain diminished somewhat, plaintiff was able to use his phone and take pictures of the condition. Those pictures are extremely humiliating. They will be entered into the record before a jury at trial. Unless the court orders otherwise. Until that time, Defendant(s) will have to be satisfied with the two sets of doctor's notes that will be attached herein.

3.     The associate medical creams, [SH VER SULFADIAZINE @ 1% RX# 1998186-16514] and pain medications were effective, but it was four weeks before the Plaintiff could begin again, at a very basic level, his regiment cycle of physical therapy. Without that therapy all said other pre-existing conditions were severely aggravated. Muscle spasms would shock-awake Plaintiff in the middle of the night with no easy

284    way to counter them Plaintiff was left to sleep for 60 or 90 minutes at a time. In other
285    words, pain-induced chronic insomnia. Muscle spasms can be scary because they are
286    uncontrollable and are always horrifically painful and when they occur in one's back,
287    100% crippling. It also severely disrupts Plaintiff's normal day schedule. All that was
288    possible was to sit and wait until it was safe again to try and sleep. The drugs and
289    lack of sleep created a brain fog rendering Plaintiff dysfunctional. All the classic
290    symptoms of being burned were also present: blistering or peeling skin, severe redness
291    and pain, fever and chills, dehydration, joint and muscle pain. It is not that Plaintiff
292    did not attempt to enter the health club during this time because he did. It is that the
293    club is a thousand-yard walk there and thousand yards back and by the time he got
294    there, Plaintiff was absolutely exhausted. Plaintiff was weak his endurance was gone
295    but standing or sitting still for long periods invited more spasms. He had to walk as far
296    as possible every day. Muscle relaxants are not an option for Plaintiff. Based on years
297    of experience the side effects are just too much so they have not been prescribed for
298    many years. It is another critical reason why plaintiff maintains said exercise regimen.
299    Because of the relentless muscle spasm Plaintiff has not been able to jog at all since
300    said burn event. So that is reasonably a permanent condition. Any attempt to do so
301    creates painful muscle spasms in the Plaintiff's back Muscles. At the time and in the
302    club, he could do little more than sit in the sauna and catch a shave and then make his
303    way home again; no exercise was possible. It was a painful exhausting 90 days to heal
304    90% of the way and another 90 days of exercise therapy to recover endurance and
305    some measure of normalcy. Over a period of the first 21 days, the entire length of
306    skin across Plaintiff's body below the neck turned ash white and peeled-off as if it had
307    been sunburned and was shedding the damaged layers. Also permanent, the shock
308    delivered to Plaintiffs' genitals every single time he enters in-to the shower.
309    Interestingly, Plaintiff always forgets about the condition. Plaintiff has no rational
310    explanation for why he forgets about it. So, each time the shower water hits said body
311    area it is always an awful surprise. Plaintiff can only hypothesize that there is some
312    type of permanent neuro damage that he only senses when water or sweat impacts said

area of his body. There was no reason for this to happen. Plaintiff's head never went below the water during said events at the health club hot tub. Only said skin from his neck down turned to ash and peeled away. It is reasonable to believe that this is a chemical burn effect, because only those areas of the body that were in the water were impacted.

a.   <u>Criminal negligence</u> refers to a defendant who acts (or has a lawful duty to act) in disregard of a serious risk of harm that a reasonable person in the same situation would have perceived. Another common definition includes an act that amounts to a gross deviation from the general standard of care.

b.   <u>Gross negligence</u> involves a greater degree of recklessness than ordinary negligence. As Cornell Law School's Legal Information Institute (LII) explains, gross negligence "is a heightened degree of negligence representing an extreme departure from the ordinary standard of care." Gibson v. Avis Rent-A-Car System, Inc., 386 So.2d 520 (Fla. 1980):

*...In this case, the court evaluated a rental car agreement with an exculpatory clause. The court found the clause enforceable with respect to ordinary negligence but noted that any waiver of liability for gross negligence would be invalid...*

## **Count 2**

### **21 APRIL 2024**

4.    The same thing happens again. Except this was a Sunday during local school Spring Break so there were even fewer people around and there was no one at the desk on the way in or out. That does not mean employees were not there. It is a phenomenon witnessed by Plaintiff many times. Maybe they are off on one of the desktop computers playing WarCraft, Plaintiff does not know. Plaintiff does remember one time arriving at the main door just as a desk attendant arrived from the bar down the street with a meal. Attached here are plaintiffs notes from said day. [SEE: NOTEs ATTACHED Pg# 08] It was Plaintiff's Doctor, after having reviewed the original said event, and pictures; who insisted that any other violations of law [her words], should be documented. And this was the origin by which Plaintiff started taking notes every time something went wrong at said LA Fitness location(s). The difference this time was that Plaintiff was ready for it. When Plaintiff realized that the

347 club could not be trusted with minimal safety standards, or Occupational Safety and
348 Health Administration rule(s) and regulation(s) [OSHA];

349       The General Duty Clause, found in Section <u>5(a)(1) of the Occupational Safety and</u>
350       <u>Health Act (OSH Act)</u>, is a key component of workplace safety regulations in the
351       United States. It states:
352           "Each employer shall furnish to each of his employees' employment and a place
353           of employment which are free from recognized hazards that are causing or are
354           likely to cause death or serious physical harm to its employees."
355           **29 <u>U.S.C.</u> § 654**
356           In essence, this clause requires employers to provide a safe working
357           environment, even in the absence of specific standards or regulations from the
358           Occupational Safety and Health Administration (OSHA). It's a broad mandate
359           that obligates employers to address any hazards that are known to be dangerous
360           and could cause serious harm to employees.
361       OSHA uses the General Duty Clause to enforce safety in situations where specific
362       regulations may not exist, making it a vital tool for ensuring overall workplace safety.
363       This can include ensuring safe conditions around pools and hot tubs;
364

365 While plaintiff is not an employee in a workplace, the Fitness International Health
366 Club(s) LLC are operating a workplace. The conditions that existed and allowed
367 plaintiff to be burned in a hot tub in this workplace are prohibited under said United
368 States Federal Law, Rules, and Regulations. These rules and regulations impose a
369 lawful duty upon Defendant(s) to maintain a strong safety culture. It is up to the court
370 to decide or assess the violation herein. It would be reasonable if the court imposed a
371 very large fine for violation of said law, rules, and regulations because the failure to do
372 all lawful diligence in establishing and maintaining a safety culture that not only places
373 the employee(s) at risk but creates public risk because the venue is a public venue.
374 Defendants are not allowed under law to look the other way where safety is concerned;

375       **Florida §442.007:** Safety; employer responsibilities--Every employer as defined in
376       §440.02 shall furnish employment that is safe for the employees therein, furnish and
377       use safety devices and safeguards, adopt and use methods and processes reasonably
378       adequate to render such an employment and place of employment safe, and do every
379       other thing reasonably necessary to protect the lives, health, and safety of such
380       employees...; [*THIS IS THE LAWFUL PUBLIC POLICY OF THE STATE OF FLORIDA*]

381 It is not enough to put up a sign when there is a lawful duty to make sure nobody gets
382 hurt. No one can create safety with a sign because no one can guarantee the sign will
383 be read in time to prevent any harm. All due diligence requires that they do anything
384 and everything to be damn certain nobody gets hurt. The preponderance of facts
385 presented herein this complaint demonstrates that an effective safety culture does not
386 exist within the property(s) owned and operated by Defendant(s); and the court is
387 respectfully requested to observe based on the facts presented here in this complaint
388 that alleged behavior(s) are habitual and ongoing; and upon presentation of a motion
389 to the court, presents sufficient good and lawful cause(s) to revoke Defendant(s)
390 business license to operate within the State of Florida. It also provides more than
391 sufficient probable cause of criminality(s). The court would be acting within its lawful
392 authority to order the Department of Justice to identify all executive(s) respondent(s)
393 superior(s) herein; issue search warrants; find such records that identify the
394 circumstances under which these incorporate policies were created and then instituted.
395 Establish just how widespread though-out the county these situation(s) and
396 circumstance(s) are. Then, acting in the enforcement of said rules and regulations,
397 impose fines and contempt citation(s) jailing the responsible parties. If the responsible
398 parties lack all due diligence, then with all due respect; let the court impose all due
399 justice for their incompetence and lack of systemic compliance with the laws of the
400 United States.

401 5.     Because at the time of these events Defendant(s) had a lawful duty to maintain
402 a well-defined safety standard(s) for their employees and the public and their lack of
403 compliance has allegedly led directly to these events witnessed herein by this
404 complaint. [www.osha.gov/laws-regs] Upon the realization there is no Safety Culture
405 present and Defendant(s) could not be trusted to maintain lawful safety standard(s)
406 Plaintiff started paying a great deal more attention to everything that was going on
407 around him while he was in the said club, just to stay safe. Accordingly, when said
408 second burn event began, Plaintiff was able to react to the situation in the hot tub in
409 less than 30 seconds. The same thing happened. He leaped out of the hot tub and

410 directly into the lap pool. This action successfully prevented the formation of any
411 second or third-degree burns. There was no need for any medical attention. Still, by
412 the time Plaintiff made it to his home, his once favorite pair of blue underwear used
413 for exercise, had been destroyed. Pictures of what happened to both sets of underwear
414 are attached here and will be physically available for the court and jury to inspect at
415 trial. [SEE: NOTE(s) ATTACHED Pg# 08, 16 and 17] Except for the fact that the once black
416 pair of underwear were exposed longer; the patterns of the burns from the cloth in both
417 situations before and after are nearly identical. Plaintiff is physically heavy-set person
418 and where the colors of said underwear are darker is where his skin covered the cloth.
419 That is why the pattern is nearly identical. Still and unfortunately, plaintiff once again
420 had the upper layer of his derma turned to ash color and peeled away over the next 21
421 days just like the first time. The issue(s) was the constant itching and the emotional
422 duress of a serious close call that should have been avoided with a sign or a hazard
423 yellow tape. Plaintiff will present pictures of safety instruments used by the club to
424 keep people out of the pool area. [SEE: NOTE(s) ATTACHED Pg# 18, #20] It is not alleged
425 herein that LA Fitness does not possess the device(s) needed to maintain safety. It is
426 that they only use those devices when it is convenient or they remember, or they are
427 not engaged in all due diligence and or, have failed to properly train and are not
428 supervising adequately their employees, as demanded by law. The club has a water
429 testing chemical kit. Plaintiff has witnessed it used many times over the years. A
430 Discovery Question to the former manager of said club location would be: "*Did you*
431 *test the pool and hot tub every two to three hours and did you maintain a log?*"

432        (5)b.  notes of Monday, 22 January 2024 attached here:
433        "*... I arrived at the local LA Fitness around 5:30 PM. After a workout I*
434        *went into the sauna and then out into the pool. It was perhaps maybe 15*
435        *minutes after 6:00 PM and as I went down to get into the hot tub AKA*
436        *jacuzzi, I was blocked by a pool attendant. I was surprised to see him there*
437        *so late at night usually the pool is attended early in the morning when*
438        *there are less people around at this hour the club was full so there would*
439        *be many people wanting to get into the hot tub. The person who barely*
440        *spoke English warned me off because of the chemicals that were in the hot*

441     *tub. His English wasn't very good and so I didn't wanna question him I*
442     *didn't want to seem hostile or anything, so I just went for a shower. I also*
443     *spent about 10 minutes talking to someone. On my way out, the pool area*
444     *is exposed by windows at the main entrance, and anyone can look in. The*
445     *attendant was gone and there were no warning signs of any kind posted*
446     *to let anyone know that the concentration of chemicals in the hot tub was*
447     *dangerous which is why I was warned off. The people at the front desk*
448     *were either unaware or didn't care. Because of time of day,* [and people
449     volume] *they were all too busy to talk to me..."*

450 6.     One cannot do all due diligence unless one is paying attention and or has
451 established with their pool maintenance company a set of protocols that everyone is
452 trained-in to keep members safe. REASONABLY PERSON ANALYSIS: based on
453 14 years of experienced observation(s); Either there has been no training; or there has
454 been forgotten and now ignored training or, only after enough people get hurt, there
455 will be training because currently there is no safety culture. Clearly management has
456 no fear of being held accountable. That is at least one example why this complaint is
457 Respondent(s) Superior(s). The Facts presented provide Good and Lawful cause(s) to
458 approve any motion to revoke the license of any business that operates this way. Most
459 seriously, when a health club can transition what is supposed to be a therapeutic
460 jacuzzi device into a toxic acid bath capable of peeling the skin off its occupant, then
461 they have transitioned to a level of incompetence that can only be described as evil. As
462 an issue arising from the law, it is an extraordinarily reckless disregard for the safety
463 and the well-being of club membership. In section (1) herein: there was just 90 seconds
464 to deliver serious burn. It meets a reasonable person standard that the court should
465 consider most seriously what the next 30 seconds would have resulted in had Plaintiff
466 not realized the grave danger he was in.

467 7.     In Florida law, Gross negligence refers to an act taken without exercising even
468 the most basic amount of care owed to others. Such an act involves a deliberate
469 disregard for the safety or well-being of another person. Gross negligence does not
470 refer to acts undertaken with intent to harm another, but acts for which the perpetrator
471 knew, or should have known, would result in a dangerous outcome. Criminal

negligence involves a severe level of disregard for safety and risk. It's not merely about failing to act responsibly but about acting in a manner that grossly deviates from what is expected of a reasonable person. Letting someone walk into an acid bath having a duty to know what harm it will do grossly deviates from what is expected of a reasonable person and moves clearly and reasonably into criminality(s). Noting: there is no protocol at LA Fitness that requires pool maintenance people; subcontractor, to arrive at said club, announce their presence to the manager or other employees; then be supervised by an employee while they do their maintenance. Plaintiff has personally observed said pool subcontractor arrive unnoticed, go through a complete maintenance cycle on countless occasions, and leave without contact with the front desk. Why? No Safety Culture at all. Nothing;

> Culpable negligence means voluntary and conscious conduct, including a failure to take reasonable precautions, which creates an unreasonable risk of harm to persons or property and demonstrates a lack of regard for human life or an indifference to the consequences of one's action. See: section 877.03(1) of the Florida Statutes,
>
> In Florida, **Reasonable care** involves acting rationally or logically to prevent harm to others: SEE: State v. Dorsett 158 So. 3d 557 (Fla. 2015) [Attached]

6(b)   Plaintiff respectfully motions the court for a finding of culpable and or gross negligence.

**Count 3**

8.   **42 U.S.C. § 1983 and privacy:** issues arising at law bathroom/locker rooms; basic legal analysis involves understanding the expectation of privacy. Locker rooms are generally considered areas where individuals have a reasonable expectation of privacy. People use these spaces to change clothes, shower, and engage in other private activities like personal grooming, and in this complaint, includes an open bathroom area with frequently used standing urinals. Herein under 42U.S.C.§1983 claim, Plaintiff is alleging a violation of a Fourth Amendment privacy right. *Section 1983 provides a private right of action against those who acting under the color of law deprive someone of rights secured under the Constitution or federal law;*

See: <u>Bauer v. Texas, 341 F.3d 352, 357</u> (5th Cir.2003) [Cit ATTACHED]. Although the sanctity of the home has been strongly reaffirmed, protection of privacy in other contexts becomes more problematic. A two-part test that Justice Harlan suggested in Katz often provides the starting point for analysis. SEE: Bond v. United States, <u>529 U.S. 334</u>, 338 (2000) [Cit Attached]. The first element, the "subjective expectation" of privacy, has largely dwindled as a viable standard, because, as Justice Harlan noted in a subsequent case, "our expectations, and the risks we assume, are in large part reflections of laws that translate into rules the customs and values of the past and present." See: Smith v. Maryland, <u>442 U.S. 735</u>, 740 n.5 (1979). [Cit attached] As for the second element, whether one has a "legitimate" expectation of privacy that society finds "reasonable" to recognize, the Court has said that "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Rakas v. Illinois, <u>439 U.S. 128</u>, 144 n.12 (1978). [Cit attached] see also: California v. Ciraolo, <u>476 U.S. 207</u>, 211, 106 S.Ct. 1809, <u>90 L.Ed.2d 210</u> (1986)

9.    "...While the determination of an objectively reasonable expectation of privacy is a question of law for the court, it is also a highly fact intensive inquiry..." See <u>O'Connor v. Ortega, 480 U.S. 709</u>, 718, <u>107 S.Ct. 1492, 94 L.Ed.2d 714</u> (1987)

For this reason, Plaintiff will present his notes. Beginning with the fact that a man in the woman's bathroom or locker room and a woman in the men's locker room is a penial code violation in Florida: <u>Section 877.03 - Breach of the peace; disorderly conduct;</u>

> ...*Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083. Fla. Stat. § 877.03. <u>Disorderly conduct generally refers to behavior that disturbs the peace, morals, or safety of the public.</u> This can include a wide range of actions such as being drunk in public, causing a disturbance, or engaging in <u>lewd behavior[s]</u>.* Specific definitions can vary by jurisdiction, but the core idea is behavior that causes annoyance, alarm, or inconvenience to others... *For example, being naked in a man's bathroom, locker room or shower and having a stranger, a female employee, just walk-in.*

10.    Without exception(s), the entire point of the construction and inclusion of a locker room in any health club in North America is done knowingly, and with purpose, to deliver a gender specific level of privacy consistent with common law and long established social standards and protocols for those locations, where therein an

545  ordinary reasonable individual can disrobe and be naked; and is literally, an
546  environment that is consistent with customary and normal community standards
547  assigned for said purpose. In Florida, that means that men stay out of the women's
548  bathrooms and locker rooms and women stay out of the men's bathrooms and locker
549  rooms and that is not an unreasonable standard. It is Plaintiff's understanding that the
550  said standard(s) originates with common law and is over 300 years old and is a normal
551  reasonable person standard of behavior.

552      Plaintiff's Notes: 14th February 2024 attached

553  *On or near about 1:45 PM I arrived 15 W Crystal Lake St. Orlando FL*
554  *which is just off South Orange Dr. a major north/south artery in Orlando*
555  *FL. This is apparently the newest LA Fitness in Orlando. I went to check it*
556  *out. Parts of it are still under construction. Its structure suggests that LA*
557  *Fitness simply brought out a previously existing gym. I was impressed by*
558  *the quality and thought it was a nice place. I liked it and for the first time*
559  *it includes both a steam room and a sauna which is a big change for LA*
560  *Fitness. When I entered the men's locker room there was a woman in there*
561  *an employee apparently doing cleaning and she was walking about while*
562  *men were taking their clothes off getting ready to do a workout or go into*
563  *the pool area. Because it's a new gym and nobody there knows me on the*
564  *way out, I decided to challenge the manager as to why there was a woman*
565  *in the men's room. I was careful to point out that men in a woman's locker*
566  *room is as illegal as a woman in a man's locker room. And when I said*
567  *illegal, I specifically meant the Penal Code of the state of Florida. I was*
568  *very clear on this point. And the man behind the desk clearly understood*
569  *what I was talking about. This manager stated to me and no uncertain*
570  *terms that it is a uniform company policy that female employees are*
571  *allowed to go in the men's room. He did not wish to get into any legal*
572  *disputes with me, but he made it clear that it was not his idea he was just*
573  *following company policy. He continued to explain that when he went off*
574  *to do manager training, he was instructed that whomever is assigned for*
575  *that shift as the person who cleans, they clean both bath and locker rooms,*
576  *regardless of gender, and that is a national company policy.*

577  11.   Said manager, or any of the LA Fitness managers who attended said type of
578  management training can be summoned before the court and heard on the record.
579  Plaintiff would likely have to motion for a court order vacating any Non-Disclosure
580  Agreement(s); asserting no such agreement/contract could be enforceable if its
581  purpose is to defeat any penial code or hide unlawful or criminal conduct. This said

582 alleged policy is a national policy and is a clear reason why this complaint must be a
583 federal question. In said case <u>Katz</u> (1967), the Supreme Court established a standard
584 of privacy that was meant to be uniform across the entire jurisdiction of the United
585 States Constitution. Herein now the question before the federal court: Is Fitness
586 International, aka, LA Fitness a company engaged in Interstate commerce? <u>Can an</u>
587 <u>Interstate Incorporation create a national policy that seismically establishes an</u>
588 <u>exception to said U.S. Supreme Court legal finding(s)</u>? Did Fitness International
589 create a National Interstate Policy which acts under the color of law and permits
590 women [employee] who have no cause of action in the men's room and men in the
591 woman's room? Is there any issue <u>arising at law</u>, that necessitates female employees in
592 the men's room and male employees in the women's room? In an Emergence response
593 yes because it does not breach common community standards of privacy. Cleaning is
594 a daily semi hourly process not an emergency and maintaining community privacy
595 standards is simple matter of basic personnel scheduling.

596 12.     Sometime in 2014 in Stuart, Florida; the local LA Fitness manager clarified a
597 Fitness International company policy which made little sense. There was an incident
598 and after that incident it was explained that what is supposed to happen, for example,
599 a male employee is sent into the men's locker room and tells all the men therein that a
600 female employee is going to come in and clean. "...Does anyone have a problem with
601 that?"... Reasonably, if somebody has no clothes on, they're going to have a problem
602 with that and that is supposed to shut the situation down. Employees are supposed to
603 post printed signs outside the entranceway stating that woman is in the men's room
604 cleaning and vice versa in the women's room; different colors. That sign is supposed
605 to come down when they're done and go back up again after a male employee has
606 cleared the way every single time without exception(s). An analysis of the situation is
607 more than just a little stupid. If you have a male employee, go into the men's room
608 and tell everybody a woman's going to come in then why not (instead of violating laws)
609 just have that male employee do the cleaning instead of humiliating and invading the
610 privacy of everyone in the locker room and vice versa in the woman's locker room? If

611    it is an employment assignment issue, then why not simply employ a male person to
612    clean the men's room and a female person to clean the woman's room? That way no
613    violation of the law occurs. In the last 14 years Plaintiff has <u>never</u> experienced said
614    protocol executed. The incident that created the opportunity for plaintiff to learn about
615    this policy involved an elderly disabled person. He was in the pool area for almost an
616    hour before closing with his personal medical attendant. He had been lifted in and out
617    of the pool and moved about by use of a wheelchair. He was waiting for "the woman
618    in the men's room sign" to be removed so that his attendant could wheel him into the
619    handicapped shower and wash him down. But the sign was not coming down and time
620    was running out because the club was getting ready to close for the night. Plaintiff
621    finished his last lap in the pool then went into the men's room and discovered the
622    female janitor, a teenage girl, standing next to the men's urinals discussing God knows
623    what with a teenage boy. I pointed out to her as politely as I could, that there was a
624    disabled man waiting for her to leave so he could use the showers. Her rude response
625    was to point out that the signs were up and if anyone didn't like it that was just too
626    bad. This adds to the Federal Question before the court in that it relates directly to the
627    <u>Americans with Disabilities Act</u>. Which is the reason why said lift devices were
628    installed at said health club to comply with said ADA Act. It [otherwise] makes clear
629    however that as a company, Fitness International has established an Interstate policy
630    designed to override federal protections associated with privacy. People are forced to
631    just live with it because doing something about it means that you risk losing the
632    convenience of your membership, and you are going to have to spend money on
633    judicial review in the federal district, that would cost way more than any three years
634    of membership club dues, and there is a theoretical possibility court might decide it is
635    not interested in protecting privacy rights anymore. There is no positive economic
636    cost-benefit analysis when it comes to private party legal law enforcement, and this
637    has been going on for more than a decade and has never come before the court. As a
638    result, the laws of the state are violated daily. The decision(s) of the Supreme Court
639    are ignored. People just sit and take the humiliation. Plaintiff would also point out that

640 there is no reason arising at law that would prevent the cleaning of the locker rooms
641 either before the club is open or after the club is closed. There is no physical reason, or
642 logical reason, for a woman to be in the men's room or a man and the women's room.
643 There are many reasons arising from the law why it should not ever happen except in
644 an emergency, but by their performance Defendant(s) obviously do not care and they
645 are not worried about any legal ramifications. A picture of said printed "sign(s)" used
646 to warn people a woman is in the men's locker room will be attach to this complaint.
647 Respectfully, the court will please observe that the sign is of a complete uniform design.
648 Said printed signs are the same wherever one goes in the LA Fitness system, they look
649 exactly alike; aka: One Size Fits All. [SEE; Notes Attached Page# 19] At Least in the
650 State of Florida. They were created to serve a uniform purpose related to company
651 policy. Are proof of a national company policy. This is a preponderance of fact, a
652 critical proof because it shows that Defendant(s) acted knowing, willfully, and with
653 purpose to violate national and state law(s). The habitual use of said sign(s)
654 throughout the LA Fitness and Fitness International system demonstrates a particular
655 uniformed intent. This one single fact is more than enough for the court to order the
656 revocation of Defendant(s) business license in Florida. When a bad actor repeatedly
657 robs one bank after another bank, they have created for themselves a systemic intent
658 to violate the laws of the United States. While this is a very harsh example it makes
659 the point that systemic action(s) by bad actor(s) is unlawful regardless of the reason(s)
660 or the standard of law being violated. Accordingly, if the court agrees to Plaintiffs'
661 motion to revoke in Florida it is likely enough good cause to revoke all their business
662 license(s) in every state. As to this complaint, the details about said sign are clear and
663 convincing aggravating circumstance demonstrating purposeful intent on the part of
664 the Defendant(s); and they are almost the same as they were in 2014, while Plaintiff
665 was living in Stuart, Florida.

666 13. Florida HB 1521 signed-into-law in May 2024, and became effective July 1st,
667 2024. The bill, also known as the Safety in Private Spaces Act, introduces penalties for
668 people using a public restroom or changing facility not aligned with their gender

assigned at birth. Fla.Stat.§553.865. Unfortunately, this statute is politically charged but it is also the Law of the State of Florida. The issues surrounding its new incarnation notwithstanding, insofar as his lack of expertise in the law allows Plaintiff to evaluate the new statue; it just seems to be an itemized list of things that are already unlawful and otherwise enforceable under said Disorderly Conduct statute. Nothing has actually changed. It is not the Plaintiffs' Intent here to participate in the public issues surrounding said statue and this complaint should not be assessed in the light of any controversy. Insofar as the statute is enforceable, it has become technically relevant to Plaintiffs' complaint against Defendant(s). [Attached: CITATION Index]: Florida Safety in Private Spaces Act SEE: Fla.Stat.§553.865 (6)(d):

> *(6) For purposes of this section, a person may only enter a restroom or changing facility designated for the opposite sex under the following circumstances: ...*
>> *...(d) For custodial, maintenance, or inspection purposes, provided that the restroom or changing facility is not in use; or...* [attached INDEX Citations pg#6]

Plaintiff's Notes: **8 August 2024** [notes attached herein]
> *I arrived at the Michigan street LA Fitness at near or about 12:00 PM. I proceeded immediately with a low impact workout which is part of my needed physical regiment to help manage my disabilities. Upon my completion I entered the men's locker room. There were not one but two women inside cleaning. Most of the men present in the locker room maybe 7 in total we're only wearing undershorts or less. Literally the underwear they showed up in. They had disrobed and were either preparing to work out, to go for a swim, to go into the sauna, and there were these two women (I had never seen before in the club) just walking about humiliating them with their presence. When I walked into the sauna there was at least one person with no clothes on at least one person in the shower opposite sauna. I think it's reasonable to be able to change your clothes and take a shower without members of the opposite gender walking around... it's the reason why they built the locker room in the first place.*

Plaintiff's Notes: **10 August 2024** [attached herein]

704　　　　　*I arrived at the Michigan street LA Fitness at near or about 5:30*
705　　　　　*PM. I proceeded into a very short work-out. Two different aerobic exercise*
706　　　　　*devices for a solid 15 minutes. The club is distinctly busy for this time of the*
707　　　　　*day, and day of the week, which is Saturday. There seems to be a great*
708　　　　　*many more people than normal and as I entered the men's locker room*
709　　　　　*this truth was reinforced by the fact that there were more men in the locker*
710　　　　　*room than I have seen in quite a long time. The sauna was standing room*
711　　　　　*only which I have not seen in a very long time. Nobody seems to care about*
712　　　　　*that fact, they just stand around and sweat at 180°. The showers were in*
713　　　　　*full use by at least four or five individuals, and I know this because the*
714　　　　　*window on the sauna faces the showers. And into this mass of naked and*
715　　　　　*half naked men walks the cleaning lady. No warnings, she just walks right*
716　　　　　*in. There is a sign up about women in the men's room but there's always a*
717　　　　　*sign up about women in the men's room even when there is no women*
718　　　　　*therein, and it never goes down. So, there's no real way anymore to know*
719　　　　　*if there's a woman in the men's room or not or vice versa in the women's*
720　　　　　*room. She's [cleaning woman] hard to miss because the conversation she's*
721　　　　　*having on her phone while she walks about can be heard by everyone in*
722　　　　　*the locker room. I said nothing to her because in the past when I've*
723　　　　　*mentioned this to cleaning people, the issues about them being in the men's*
724　　　　　*room, they get really upset and take it personal and go complain about*
725　　　　　*me. Which is why I haven't done such a thing since the end of COVID. It's*
726　　　　　*humiliating to have some stranger walking in on top of you why you have*
727　　　　　*your clothes off and so unnecessary.*

728

729　　14.　　The court will please note for the record that said <u>FL: §553.865</u> (6)(d) specifies;

730　　　　　　　　　　　　　　"… not in use…"

731　It does not denote; ***send an employee in and throw everyone out.*** It is simply an itemizing

732　standard that has been long established by said Disorderly Conduct statute(s) and does

733　not represent any type of challenge to any new idea(s) associated with social diverse

734　individual personality(s). Plaintiff also respectfully request, the court notes for the

735　record under the Rules of <u>Federal Procedure; rule #23; Class Action</u>. At this time

736　plaintiff will not be making any motion under this rule but is cited here, and to

737　challenge more specifically, any suggestion that this complaint is something other than

738　a Federal Court issue. The focus here is on a National Interstate Corporate Policy

739　established by Defendant(s) related to the cleaning of gender specific locker rooms. If

740    one were to go down the list in said section of the federal procedure rule(s), and check-
741    off all the right boxes, then the federal court would have a new, larger, and very serious
742    class action issue to deal with. Such an action is not possible per se. It would require
743    intervention by a specialized and experienced law firm. Unaffordable by this Plaintiff.
744    It does reinforce however that this is a federal court dispute. It is also reasonable that
745    the court would consider this; as an issue arising from law; an <u>Aggravating Factor</u>.
746    Another Aggravating Factor the court is asked to consider is <u>California Civil Code</u>
747    <u>§1708.8</u>. People in the state of Florida might be shocked to learn that invasion of
748    privacy, and the pointlessly deliberately humiliating people, is also unlawful in the
749    state of California where Defendant(s) hold lawful domicile.

750    15.    Under the circumstances complained herein to the court, there is likely a need
751    for the court to make a ruling as to if; can the Defendant(s) create an exception to the
752    penal code(s); or, can the defendants create an exception to the findings of the United
753    States Supreme Court using a contract? These questions of law are placed before the
754    court in light of the fact that there is no rationale, or reasonable person motive(s) for
755    the club to be violating the standard(s). Also, before the court, the issue of if
756    Defendant(s) can use a written sign and or poster to create an exception to the law and
757    these questions will be placed before the court with considerations to ruling(s) both
758    under federal and state standards;

759          •   As a general rule, **bodily injury or property damage** is an essential
760             element of a cause of action in negligence. Monroe v. Sarasota Cnty.
761             School Bd., <u>746 So. 2d 530, 531</u> (Fla. 2d DCA 1999);
762
763    In other words, a plaintiff fails to state a cause of action for criminal or culpably
764    negligence unless the plaintiff pleads and proves that he or she suffered damages due
765    to the Defendant(s) performance or lack thereof where there is a duty to act. Plaintiff
766    herein has set forth his proofs and incorporates as part of this complaint a set of notes
767    by date, each a separate count of the violation(s) of law and for which Plaintiff requests
768    relief on each count. NOTE: these date(s) and time(s) are only the most prominent
769    event(s). There are dozens of more examples occurring across many different clubs in

770  the Orlando, Florida, Orange County area(s) for the last five years. But Plaintiff did

771  not start writing them down until after his doctor insisted. Plaintive regrets any

772  grammatical or spelling issues when reading said notes. They were literally dictated

773  into a microphone and then transcribed into print by a computer for archival purposes.

774  When first created there was no clear intent to initiate a lawsuit. That intent did not

775  begin until after said second hot tub event detailed herein.

776  Notes Attached and Incorporated here: On **Count 3**:

777  A.  February 5th through 9th, 2024, incorporated as part of this
778  complaint;

779  B.  February 14th, 2024, incorporated as part of this complaint;

780  C.  March 13th, 2024, incorporated as part of this complaint;

781  D.  March 22nd, 2024, incorporated as part of this complaint;

782  E.  April 21st, 2024, incorporated as part of this complaint;

783  F.  May 6th, 2024, incorporated as part of this complaint;

784  G.  July 29th, 2024, Posted after July 1st, 2024:
785  Fla.Stat.§553.865, incorporated as part of this complaint;

786  H.  August 3rd, 2024, Posted after July 1st 2024:
787  Fla.Stat.§553.865, incorporated as part of this complaint;

788  I.  August 10th, 2024, Posted after July 1st 2024:
789  Fla.Stat.§553.865, incorporated as part of this complaint;

790  J.  August 16th, 2024, incorporated as part of this complaint

791

792

793

794

795

796

797

798 **Analysis and Basis for Relief:**

799

800 **Counts 1 and 2:**

801 **Florida Statute §784.05**

802 16. (1) Whoever, through culpable negligence, exposes another person to personal
803 injury commits a misdemeanor of the second degree, punishable as provided in
804 FLORIDA § 775.082 or §. 775.083

805 17. (2) Whoever, through culpable negligence, inflicts actual personal injury on
806 another commits a misdemeanor of the first degree, punishable as provided in
807 FLORIDA § 775.082 or §775.083;

808 Culpable negligence in health clubs involves cases where the negligence of a health
809 club or its employees leads to harm, and the health club can be held liable for those
810 negligent actions;

811     a.     Key Principles in Culpable Negligence Cases Involving Health Clubs:
812            Scope of Employment: For respondent superior to apply, the employee's
813            negligent actions must occur within the scope of their employment. This
814            includes actions directly related to the performance of their job duties or within
815            the context of their job responsibilities.

816     b.     Duty of Care: Health clubs owe a duty of care to their members to
817            maintain safe facilities, provide proper training to employees, and supervise
818            activities to prevent foreseeable harm. Failure to meet these standards can result
819            in liability(s).

820     c.     Foreseeability and Direct Causation: The negligence must be a direct
821            cause of the harm suffered by the plaintiff. A court will examine whether the
822            negligence was foreseeable and whether it directly led to the injury or damage.

823 18. **Contract:** Plaintiff does not remember ever reading, possessing, or signing a
824 contract with Defendant(s) LA Fitness, aka, Fitness International; in either Stuart,
825 Florida or Orlando, Florida. Said belief nevertheless it is not meant to suggest that a
826 contract does not exist. Plaintiff is confident that his insurance company would not

827  have picked-up the costs of the health club membership in the absence of a contract.
828  These allege possibilities notwithstanding; any assertion(s) by Defendant(s) as to
829  details and requirements regarding liabilities associated with any contract(s) and their
830  health club(s), in so far as they relate to this complaint; Plaintiff demands presentation
831  of a contract, for any assertions that attempt to create exceptions to those issues
832  complained herein. In the absence of a contract there is no foundation of fact and
833  Plaintiff objects to any assertion(s) related to a contract without said presentation, as
834  hearsay. Additionally, Plaintiff objects to any assertion(s) directed by content of any
835  contract that redirects relief of harm related to violation(s) of the penial code(s) to some
836  other venue outside the judiciary.

837  19.   a.   The Court(s) has [have] declared that a contract "inconsistent with the
838       public interest or detrimental to the common good" is unenforceable. Vasquez
839       v. Glassboro Serv. Ass'n, Inc., 83 N.J. 86, 98, 415 A.2d 1156 (1980). Allowing
840       health clubs to dictate the terms of an agreement that eliminates their duty to
841       exercise a reasonable degree of care toward their patrons is inconsistent with the
842       public good. Pulice v. Green Brook Sports & Fitness, L.L.C., 197 A.3d 184, 186
843       (N.J. 2018) New Jersey is cited herein allegedly because it has more health clubs
844       per square mile than anywhere else on this planet.

845

846       Exculpatory clauses:

847       **As A Florida State Issue:**

848       b.   ...We find the instant case similar in material respects to the Second
849       District's decision in Murphy, 974 So.2d at 568, and the Fifth District's decision
850       in UCF Athletics Ass'n Inc. v. Plancher, 121 So.3d 1097 (Fla. 5th DCA 2013)
851       (quashed in part on different grounds by Plancher v. UCF Athletics Ass'n Inc.,
852       175 So.3d 724 (Fla. 2015) [Attached]. In both cases, our sister courts held that,
853       despite an exculpatory clause's waiver of liability for "any negligence" or "all
854       claims," other provisions in the clauses created an ambiguity or confusion for a
855       reasonable reader, rendering the exculpatory clause unenforceable. See also

856   Brooks v. Paul, <u>219 So.3d 886</u> (Fla. 4th DCA 2017) (holding that although two
857   sentences in an exculpatory clause "are broad and arguably encompass a
858   negligence claim," because "there is additional language in the release that
859   creates ambiguity about exactly what type of claims are being released,"
860   summary judgment was not proper.) Fresnedo v. Porky's Gym III, Inc., <u>271 So.</u>
861   <u>3d 1185, 1189</u> (Fla. Dist. Ct. App. 2019)

863   20.   **As A California State Issue:**

864   (1)   An exculpatory contract releasing a party from liability for future
865   ordinary negligence is valid unless it is prohibited by statute or impairs the
866   public interest. (Tunkl v. Regents of University of California (1963) <u>60 Cal.2d</u>
867   <u>92, 96, 98, 32 Cal.Rptr. 33, 383</u> P.2d 441.) Releases in the context of recreational
868   sports or exercise facilities generally do not impair the public interest. (Capri v.
869   L.A. Fitness International, LLC (2006) 136 <u>Cal.App.4th 1078, 1084, 39</u>
870   Cal.Rptr.3d 425.) A valid release precludes liability for risks of injury within the
871   scope of the release. (Paralift, Inc. v. Superior Court (1993) 23 <u>Cal.App.4th 748,</u>
872   757, 29 Cal.Rptr.2d 177.);

873   (2)   A release of liability for future gross negligence, in contrast,
874   generally is unenforceable as a matter of public policy. (City of Santa Barbara
875   v. Superior Court (2007) <u>41 Cal.4th 747</u>, 750–751, 777, <u>62 Cal.Rptr.3d 527</u>, 161
876   P.3d 1095 (City of Santa Barbara)[Attached]. Ordinary negligence consists of a
877   failure to exercise reasonable care to protect others from harm, while gross
878   negligence consists of "a ' " 'want of even scant care' " ' or ' " 'an extreme
879   departure from the ordinary standard of conduct.' " ' [Citations.]" (Id. at p. 754,
880   <u>62 Cal.Rptr.3d 527</u>, 161 P.3d 1095 ; see Calvillo–Silva v. Home Grocery (1998)
881   <u>19 Cal.4th 714,</u> 729, <u>80 Cal.Rptr.2d 506</u>, 968 P.2d 65 ["gross negligence ...
882   connotes such a lack of care as may be presumed to indicate a passive and
883   indifferent attitude toward results"], disapproved on another ground in Aguilar

884    v. Atlantic Richfield Co., supra, 25 Cal.4th at p. 853, fn. 19, 107 Cal.Rptr.2d
885    841, 24 P.3d 493.)

886

887    21.    In Florida, even when there is an exculpatory clause within a contract the
888    Florida courts have already decided on a very strict scrutiny protocol when dealing
889    with negligence...;

890        *University Plaza Shopping Center, Inc. v. Stewart,* 272 So. 2d 507 (Fla.
891        1973): The Florida Supreme Court ruled that an exculpatory clause in a lease
892        agreement was unenforceable because it attempted to absolve the landlord
893        of liability for gross negligence; [attached]
894        *Murphy v. Young Men's Christian Ass'n of Lake Wales, Inc.,* 974 So. 2d
895        565 (Fla. 2d DCA 2008): This case involved a waiver signed by a gym
896        member. The court found the exculpatory clause unenforceable because it
897        was not sufficiently clear and specific about the risks being waived...;
898        [attached]

899

900    This matter is before the court in violations of the penal code(s) of the State of Florida
901    and those violations of federal law previously stated herein. ALLERGY: If said health
902    club posted a sign that said: *"beyond this point rape is an acceptable practice and if you*
903    *get into our jacuzzi and your skin begins to dissolve and burn-off that's too bad;"* Plaintiff
904    understands that is an outrageous example, but it makes a heavy critical point. Herein
905    the court is reviewing an egregious violation of public policy.  Are there any legal
906    grounds at all, extreme or basic, when incorporations can violate public policy by
907    limiting how much the Penal Code applies to them? If the court finds that an
908    exculpatory clause in an alleged contract does create such exceptions; then plaintiffs'
909    complaint might possibly fail as an issue of law. Respectfully, the court is examining
910    whether the health club fulfilled its responsibilities to provide a safe environment for
911    its patrons and whether said criminal negligence directly caused said injury(s).  In the
912    past health clubs have suggested that its members are under no compulsion, economic
913    or otherwise, to participate, much less to sign the exculpatory agreement, because it
914    does not relate to essential services, but merely governs a voluntary recreational
915    activity. But Plaintiff did not voluntarily walk into a hot tub that had been transitioned
916    into an acid bath by agents of Defendant(s).  In fact, Plaintiff is a rule follower a keeper

917 of protocols and common standards of reasonable behavior(s). As the court reviews
918 and considers the issue of voluntary conduct and health club lawful duties it should
919 also respectfully consider most seriously that these health clubs are sales organizations
920 that systemically solicit vulnerable populations like minor children. Public policy
921 places a higher concern and standard(s) of safety regarding children and elderly adults.
922 The probability of heightened concern regarding these populations is an issue arising
923 in public policy. It is before the court as to if any organization can circumvent these
924 public policy concerns using a contract. We could identify such a clause in a contract
925 as a: "...too bad so sad we don't care about vulnerable populations and the risks to
926 these populations from a health club environment..." The court is asked to consider
927 such a clause in light of any other safety protocol established in law and as a matter of
928 public policy.

929 22. The danger to the public interest(s) is overt, imminent, and ongoing and
930 involves minors. Adolescents, person(s) under age 18 years; allegedly and most
931 commonly; can lack the experience and necessary training to operate weight lift
932 equipment safely. Plaintiff makes this statement based on years of experienced
933 observation(s); watching minors do sometimes incredibly incompetent [STUPID]
934 things using weight equipment at LA Fitness Club(s). The use of weights to exercise
935 requires systematic execution of good form and proper technique. The importance of
936 form and technique cannot be overstated. It is the reason why weight rooms are
937 surrounded by mirrors. To use weight equipment with good form and technique one
938 needs to be able to see what one is doing. That is what mirrors are for. Minor children
939 show up, aged 14, no training and no clue what the mirrors are for and in a club where
940 management does not police its own operation(s). There is allegedly and based on
941 years of observation(s) by Plaintiff; no practical or rational way to do all lawful due
942 diligence and allow people who have not been trained in the use of weights for
943 exercise, and still somehow avoid any liabilities associated with the harm that can be
944 done. Because contract(s); which should NEVER Apply to children, that wave
945 negligence claim(s), and the costs of judicial review: the harm done is almost never

946 **reported**. This is just one example of the Defendant(s) just looking the other way and
947 getting away with it. Herein the Federal District Court is asked to consider if such
948 harm should go on continuously unchecked and unsupervised. Clearly the State of
949 Florida has no problem looking the other way. If anything goes wrong, according to
950 the Supreme Court of the State of Florida, the only lawful duty a health club has is to
951 dial 9-1-1. SEE: Fitness v. Mayer 980 So.2d 550 (Fla.App. 4/23/2008):

952 *...On appeal, L.A. Fitness contended that it had met the applicable legal*
953 *standard of care because "Strayer and Bailey immediately advised their staff to call*
954 *911 when they heard a call for help and then quickly ran over to Tringali to check*
955 *his condition"...;* [citation with full text SEE: Index of Citations attached]
956
957 Respectfully asserted; that is an inadequate standard under the equal protection clause
958 and standards of United States Law and some kind of incredibly lame excuse not to
959 hold people accountable for the businesses they developed; that are inherently
960 dangerous, and yet under state law they cannot be held accountable for those
961 danger(s); they created, for corporate commerce and personal enrichment. There are
962 many other businesses voluntarily used vulnerable population(s) in the State of Florida
963 like amusement parks that have inherently dangerous equipment used for
964 entertainment purposes just like Fitness International. Testifying strictly from nearly
965 15 years of experience, LA Fitness Clubs are a place of entertainment and social
966 interaction, and they are designed and built to be that way; TV Screens everywhere
967 with the latest news and sports shows. It is an entertainment venue. Said: Fitness v
968 Mayer **980 So.2d at 562;** was all about the fact that Fitness International in its clubs
969 does not maintain defibrillators and employees trained to use them. It is not that they
970 do not have trained employees, they do, trained in sales trained in physical fitness
971 some even certified. Fitness International does train its employees and covers those
972 costs as part of their operation(s). No one, apparently, knows how or is trained to
973 operate a defibrillator? The basic operations of which can be learned via a 20-minute
974 video on YouTube. Other entertainment businesses are held to a safety standard in
975 the State of Florida. The State of Florida conducts inspections to make sure that all

due diligence is being executed. One would not be surprised to allegedly find defibrillators there and Employees who know how to operate them. Yet the State of Florida looks the other way when it comes to health clubs. If one cares to analyze how health clubs are classified within the state licensing system, they are found under the heading of "elevator companies" and yet the use of their equipment can be as dangerous as any found at any amusement park. Fitness international actively recruits elderly people and families with teenage children. These are two social subgroups that American Society [public policy] has recognized for decades as requiring heightened needs and or supervision. On 24 August 2024, plaintiff informed his attending physician Dr. Miranda, that her notes would be used in this complaint. The doctor respectfully asked that the court consider most seriously that when said burn event(s) occurred in the LA Fitness hot tub to Plaintiff; that the circumstances did not reach plaintiff's face and eyes. Such exposure would have been catastrophic given the circumstances. The doctor also requested the court to consider what would have happened had said circumstances applied to an elderly person, sitting in a hot tub attempting to treat their arthritis; accordingly, a person with limited locomotion who could not have moved fast enough given the circumstances described herein by Plaintiff. The doctor was asserting a reasonable person analysis to something that would have been catastrophic because the attendance upon the hot tub by employees of said health club is so systematically indifferent there is no reason to believe they would have noticed anything was wrong in time to render even the most meager amount of assistance. Because of the near absences of a safety culture just dialing 9-1-1 would have been stupendously inadequate. Based on years of observation plaintiff can testify herein that even though the employees at the front desk sit right next to the window in front of the hot tub, because their backs are always to the pools, and the architectural safety glass creates an exceptionally good sound barrier, unless somebody deliberately pulls their attention to an event ongoing in the pool area; they have no clue what is going on. Somehow these simple fact(s) and observations were lost on the Supreme Court of the State of Florida when they decided all a health club is obligated

1005    to do is dial 911. In that this standard so violates the equal protection clause of the

1006    constitution of the United States Plaintiff considers motioning the court to vacate

1007    **Fitness v. Mayer <u>980 So.2d 550</u>** (Fla.App. 4/23/2008) In doing so plaintiff

1008    respectfully asks the court to consider most seriously the fact that on endless occasions

1009    beyond plaintiff's ability to count, he has chastised teenagers in the hot tub for putting

1010    their heads under the water. Exposing one's eyes and ears to that level of chemical

1011    concentration is crazy behavior. Defendant(s) however, do not police their own clubs

1012    and do not supervise the juveniles they actively solicit. Incompetence is not a

1013    voluntary activity particularly where there is a lawful duty to maintain a safety culture,

1014    and said; Fitness v Mayer, represents some kind of alternative reality not genuinely

1015    related to the years of observed activities witnessed by this plaintiff in the health clubs

1016    operated by Defendant(s). The Defendant(s) are not innocent bystanders sitting by the

1017    phone waiting to dial 911. They have created said circumstance(s) for the purpose of

1018    commerce and personal enrichment. Yet the state of Florida says they are not

1019    accountable for those acts of incompetence that occur within their creation.

1020    Respectfully, that violates the equal protection clause of the Constitution of the United

1021    States. The State of Florida lacks the constitutional capacity to absolve health clubs

1022    of negligence on any level when they assert voluntary conduct; but nobody voluntarily

1023    enters a health club with the purpose of killing themselves.

1024

1025    **Count 3:**    **<u>42 U.S.C. § 1983 and privacy</u>**

1026                  **<u>Florida Statute 877.03 § 553.865: inclusive</u>**

1027    23.    This complaint is a federal question before the court. In said Katz 1967, the

1028    Supreme Court established a standard of privacy that was meant to be uniform across

1029    the entire jurisdiction of the Constitution of the United States. <u>42 U.S.C.§1983</u>: This

1030    statute allows individuals to sue for civil rights violations, including those resulting

1031    from a failure to train employees adequately. Herein now the question before the

1032    federal court: Is Fitness International, aka, LA Fitness a company engaged in

1033    Interstate commerce? <u>Can an Interstate Incorporation create a national policy that</u>

1034 seismically establishes an exception to said U.S. Supreme Court legal standard(s)? Did
1035 Fitness International create a National Interstate Policy which acts under the color of
1036 law and permits the unlaw presence of women in the men's room and men in the
1037 woman's room? Is there any issue arising at law that necessitates female employees in
1038 the men's room and male employees in the women's room? Is there any obstacle,
1039 legal or otherwise, that prevents defendants from employing men to clean the men's
1040 room and women to clean the woman's room? Would doing so be considered normal
1041 by contemporary community standards?

1042 **Florida Statute 877.03 Definition:**

1043 24.     In the State of Florida, Disorderly Conduct, or FL Statute 877.03, is defined as
1044 someone committing an act that corrupts public morals, outrages public decency,
1045 disturbs the peace and quiet of others, starts a fight, or acts in a way that breaches the
1046 peace. Chapter 877 Section 03 - 2024 Florida Statutes:
1047          Respectfully, said Fla.Stat.§553.865 (6)(d): is just a new itemized list that
1048 already existed under Fla.Stat.§ 877.03;
1049          The politics surrounding the statute is unfortunate but there is nothing
1050 new. FL§553.865 enforces well-established common-law standards both at the
1051 federal and state level the only real objection(s) to it arising out of the political
1052 processes. As in all such situations one either approves of somebody's politics
1053 or they do not. As for this complaint, it is not an issue or at least should not be
1054 or should not be made one because that would be frivolous.

1055
1056 **Vicarious Liability**

1057 25.     Vicarious liability and strict liability are both different from standard tort
1058 claims. In a typical tort case, a plaintiff must prove certain things in order to be
1059 entitled to compensation. Plaintiffs must prove five elements:

1060 *The defendant(s) owed a duty of care (to act reasonably).

1061 *The defendant(s) breached that duty (usually by acting negligently or failing to
1062 exercise the care a reasonable person would have exhibited in the same
1063 situation).

1064 *The breach of duty was the direct or proximate cause of harm.

1065 *The plaintiff suffered losses that they should be compensated for.

1066 26.   Vicarious liability or when one party is liable for the negligence of another. 1067 Those who are sued under this legal doctrine can be held accountable for losses even 1068 without negligence. For example, if a server in a restaurant drops a hot pot of coffee 1069 on you and burns you, the restaurant is liable for the server's actions. The restaurant 1070 is the principal in control of the server (the agent) and is responsible for their actions 1071 in the course of their employment, even if the restaurant itself did nothing negligent. 1072 Plaintiff alleges herein that he was burnt by something way more dangerous than 1073 coffee. Defendants were equally responsible for their employee (agent) when they 1074 established policy that permitted female employees to arbitrarily enter the men's room, 1075 and male employees to arbitrarily enter the women's room in violation of previously 1076 discussed herein statute(s). There is no rational way for Plaintiff or any Fitness 1077 International member to hold Defendant(s) free from liability(s) under these 1078 circumstances, and with all due respect to the court; no reasonable way to apply an 1079 Exculpatory Clause, if one exists, in any contract if this complaint were strictly about 1080 civil liability(s). SEE: Lopez v. Martens FL Case No. 19-24609-CIV-WILLIAMS 1081 (2020) [attached]

1082 27.   **Respondent Superior**: Holds an employer or principal legally responsible for 1083 the wrongful acts of an employee or agent, if such acts occur within the scope of the 1084 employment or agency. Characteristics Test: The courts may find the employer liable 1085 for damages from the employee's actions if the courts find the employee's action as 1086 the common characteristics of the employee's job description. Scope of Employment: 1087 For the doctrine to apply, the employee's actions must be within the scope of their 1088 employment. This includes activities that are part of the job or reasonably related to 1089 the job duties. Employer Liability: Employers can be held liable for the negligent acts 1090 or omissions of their employees, even if the employer was not directly involved in the 1091 wrongful act. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) See Also: *Faragher* 1092 *v. City of Boca Raton*, 524 U.S. 775 (1998): Another significant case that outlines the

circumstances under which an employer is liable for the actions of its employees. Non-Delegable Duties: Case: *Maloney v. Rath*, <u>69 Cal.2d 442</u> (1968)

> *The California Supreme Court held that a car owner could be held liable for the negligence of an independent contractor who performed brake repairs. The court found that the duty to maintain a vehicle in safe operating condition is non-delegable, meaning the car owner retained responsibility regardless of who performed the work.*

[Respectfully: The owners of a pool or jacuzzi have the same lawful duty(s) as to safety as they are related to independent contractors.]

> *Hunt v. Bankers Trust Co.*, <u>799 F.2d 1060</u> (5th Cir. 1986) The Fifth Circuit Court of Appeals held that a bank could be held liable for the actions of an independent contractor. [In this complaint the contractor is the pool maintenance company whose details should be part of discovery]

28.    In relation to counts 1 through 3, in addition to the culpable liability asserted herein; it is Plaintiff's firm demand arising at law; upon completion of discovery that every executive officer attached to Fitness International along with every board member who had knowledge or should have had knowledge that those issues complained herein related to said counts be held individually liable in their entirety. And as to any Federal or Occupational Safety and Health Administration (OSHA) violations which may become associated with this complaint; it is Plaintiff's intent that said executives be brought to trial and held accountable. Otherwise, they are, allegedly, a big group of salespeople, and will just do it again. In Plaintiff's 30 years' experience with account executives/salespeople; they run on personal ego and not the reality of the harm their decisions can inflict. Noting for the record; OSHA's 10-hour training certificate is available to anyone via the internet.

29.    Penial Code liability is a legal concept that holds individuals responsible for their actions or omissions if they are found to have committed a violation. Penial Code liability differs from civil liability, which is based on the breach of a contract or tort. To be considered liable, an individual must have acted with intention or negligently. Respectfully, this is the central issue for the court in making any finding(s) on in deciding Respondent Superior: Negligence and Culpable Negligence.

30.     As to §1983 claims, ..."it is well-established that a 'jury may award punitive damages ... either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others.'" Morgan v. Woessner, 997 F.2d 1244, 1255 (9th Cir. 1992). In Dang v. Cross, the Ninth Circuit held this "statement of the law of punitive damages is incomplete, however. The standard for punitive damages under§ 1983 mirrors the standard for punitive damages under common law tort cases. . . . [M]alicious, wanton, or oppressive acts or omissions are within the boundaries of traditional tort standards for assessing punitive damages and foster 'deterrence and punishment over and above that provided by compensatory awards.' . . . Such acts are therefore all proper predicates for punitive damages under§ 1983." 422 F.3d 800, 807 (9th Cir. 2005) (citing Smith v. Wade, 416 U.S. 30,49 (1983)). The Dang court held it was reversible error to decline to instruct that "oppressive acts" were an alternative basis for punitive damages in a§1983 case. Similarly, punitive damages claim arising under state law are subject to state law standards for recovery which should be reflected in an alternative basis for punitive damages in a§1983 case. Coughlin v. TailhookAss'n, 112 F.3d 1052,1056 (9th Cir. 1997). [Respectfully: Fla.Stat.§553.865 (6)(d) or Statute 877.03 are well established and enforceable and establish good cause of action by the court for the application of punitive damage(s)]

31.     Whether punitive damages need to be proved by a preponderance of the evidence or clear and convincing evidence also depends on the standards applicable to the underlying claim for relief. For example, several states in the Ninth Circuit require proof by clear and convincing evidence before punitive damages are awarded on a state law claim. On the other hand, a preponderance of the evidence standard has been upheld for punitive damages in certain federal claims. See, e.g., In re Exxon Valdez, 270 F.3d 1215,1232 (9th Cir. 2001) [Respectfully: attached pictures, doctors' notes and Plaintiff's testimony and notes; provide clear and convincing evidence and establish a preponderance of evidence before discovery has begun and establishes as a matter of well-established law good cause for summary judgement and compensation and in so far as this case has proven Defendant(s) acted knowingly and with purpose to establish an interstate/national policy to violated well establish community and government law and policies; Plaintiff will respectfully motion for, summary judgement with punitive damage(s) inclusive if the law permits and the court agrees];

b.     Punitive damages are provided for in Florida Statute §768.72, which states "[a] defendant may be held liable for punitive damages only if the

trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." <u>Fla. Stat. §768.72(2)</u>

    c.    [At least in this context] …Intentional misconduct means, "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." Fla.Stat.§768.72(2)(a). Gross negligence "means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Id. at (2)(b)

    d.    The Court must find that the facts and evidence provided and inclusive herein are sufficient to establish a basis for punitive damages. See Globe Newspaper Co., <u>568 So. 2d at 519</u>. The threshold is so low at the amendment stage that "merely a representation" of what the evidence will show, rather than actual or admissible evidence, may be enough. Estate of Despain v. Avante Grp. Inc., <u>900 So. 2d 637, 644</u> (Fla. 1st DCA 2005)[Attached]. See also, Holmes v. Bridgestone/Firestone, Inc., <u>891 So. 2d 1188, 1190–91</u> (Fla. 4th DCA 2005) (reflecting that mere hearsay can satisfy the amendment standard in Fla. Stat. §768.72(1)) In Bistline, a trial court granted a motion to amend the complaint to add a claim for punitive damages. <u>215 So. 3d at 610</u>. The plaintiff in that case advised the court that "[t]he standard for determining whether a claimant has established a 'reasonable basis for recovery [of punitive damages] is similar to that of whether a claimant has stated a cause of action." Id. "The court emphasized that it was required to accept the plaintiff's allegations as true and concluded the allegations established a reasonable basis for recovery of punitive damages."

32.    Regarding the constitutional due process issues involved in the "relationship inquiry," *see* State Farm Mut. Auto. Ins. Co. v. Campbell, 538; <u>U.S.408,425</u> (2003),

1192 referring to *Gore* and *Haslip* and stating that "single-digit multipliers are more likely to
1193 comport with due process, while still achieving the goals of deterrence and retribution,
1194 than awards with ratios in range of 500 to 1, or, in this case, of 145 to 1." In *State Farm,*
1195 the Court went on to say that "because there are no rigid benchmarks that a punitive
1196 damages award may not surpass, ratios greater than those we have previously upheld
1197 may comport with due process where 'a particularly egregious act has resulted in only
1198 a small amount of economic damages.' " *Id.* (quoting *Gore,* 517 U.S.at 582.) For an
1199 application of the *State Farm* ratio principles in the context of a 42 U.S.C.§ 1981 case,
1200 *see Bains LLC v. Arco Prods. Co.,* 405 F.3d 764,774-77 (9th Cir.2005). *But see also: Exxon*
1201 *Shipping Co. v. Baker,* 554 U.S.471,51 3 (2008)

1202 33.    Plaintiff petitions the court to make a finding that Defendant(s) acted
1203 knowingly, willfully, and or with purpose, and or, with culpable negligence and thus
1204 failed to engage in all lawful duty(s) and all due diligence, based on each of counts
1205 contained herein. Upon that finding, reasonably; Defendant(s) can no longer be
1206 trusted by the communities in which they operate or the state of Florida and so;
1207 plaintiff will place a motion before the court for good lawful cause:
1208 requesting/directing the revocation in perpetuity, and with prejudice; of the
1209 commercial business license(s) of defendant(s) denying them any capacity to operate
1210 or participate in the supervision of any business or hold any interest in or with, or in
1211 association with any real person(s), proxy, and or corporate entity doing the same
1212 anywhere within the venue of the State of Florida.  Respectfully submitted that just
1213 one single violation of the federal or state penial codes is more than sufficient to justify
1214 such a revocation, in perpetuity. [respectfully] They cannot be trusted! Before any
1215 reapplication(s) Defendant(s) must first motion the court to vacate the decision.

1216
1217
1218
1219

**V.** **PLAINTIFF RESPECTFUL REQUEST(S) RELIEF**

34.    In Consideration(s) of relief Plaintiff Very RESPECTFULLY feels obligated to bring to the court's attention the issue of economy of scales involved when dealing with national and international corporations. It is a valid issue in this complaint.

> a. Reuters News Service, Wed September 14, 2022: Google loses appeal against record $4 billion EU fine

35.    In the last 24 years the American nation and the international community have seen the formations of mega national and international incorporations. Mostly, but not exclusively instigated by the growth of the internet. A national or international mega incorporation is defined by the economy of scales of the company and executive revenue(s), holding(s), and investment(s).    They all have one thing in common. Because of the economies of scale, they can no longer be touched by the legal system. Just as there are banks that cannot fail because of the economy of scale; their collapse might represent an economic threat to the entire nation; but also, their economic reach can create a threat if bad actors are involved in the policy making process(s). What is that threat? The cited event in the European Union where Google was fined over $4 billion dollars provides a prime example not just to the court but to the whole judiciary branch of government. The entire event of September 2022 was a joke. It was allegedly a show of force on behalf of the European governments to prove to their electoral base that Google was not untouchable. At the time, Google was a $600 billion dollar national and international corporation. In the fiscal quarter following said events Google brought-in over $20 billion in revenues.  Then allegedly, all their lawyers and corporate executives promptly had a celebration and proceeded to laugh off the euro zone's fine of $4 billion dollars. It was just Chump-Change.

36.    With all due respect: referencing almost any pre 2022 caselaw for Punitive Damage(s) against a multi-billion-dollar corporation is **obsolete**.  They cannot be touched.  Attempting to bring criminal charges against such a company and they allegedly start paying-off political action committees (PACs) to bring pressure on the

1249 right politicians to intervene. Defendant(s) herein are a multi-billion-dollar
1250 corporation. As long as their sales targets are met, they do not give a damn what
1251 anyone thinks about the way they do business. They cannot be touched and if their
1252 insurance company objects then they just self-insure. From their alleged perspective
1253 the issues arising from this complaint are trivial nonsense. This analysis is highly
1254 relevant to this case. In Florida after July 1st, 2024; when sending women into the
1255 men's room and men into the women's room became very specifically unlawful,
1256 reference: Fla.Stat.§877.03; The details about said law were disseminated by media
1257 nationally and internationally as political cannon fodder and information
1258 entertainment. There is no defense as to if Defendant(s) knew the law had been
1259 changed, it was publicly chastised and debated on national news networks for weeks.
1260 The only thing that really changed was that said *Disorderly Conduct* statute now had an
1261 itemized list. Defendant(s) performance, complained herein, was just as unlawful
1262 before said new law as it is after said Fla.Stat.§877.03. This is just a basic example of
1263 what happens when bad actors are in control of a multibillion-dollar incorporation(s).
1264 Defendants have a; "if you don't like it leave attitude." Not alleged. Plaintiff has heard
1265 their employees say it many times. Before COVID, Defendant(s)' started a new
1266 marketing campaign aka: Esporta Fitness. I imagine it was an effort to attract the
1267 Latin community which said club just happens to sit in the middle of. To that end, the
1268 club was to move to a 24-hour service. So, everyone who came in to sign a contract
1269 with the expectation of having a 24-hour service. To this day there's no 24-hour service.
1270 Defendants attitude is; if you don't like it leave or sue us. Allegedly, no one in this low-
1271 income community can afford a lawsuit and they fear government interaction. The
1272 fact that Defendant(s) allegedly violated the statute of frauds seems irrelevant. They
1273 do not care because you cannot touch them, and they know it. The sauna in the clubs
1274 used to be kind of nice, particularly if you have arthritis. There was an elevated floor
1275 in there because people sweat and do other things therein. The elevated floor made
1276 sure that everything drained away. Defendant(s) remove the elevated floor. Now if
1277 you want to use the sauna you have to walk through the water of the men that were

1278    there previously. Some are in bare feet, some wear shoes and those who wear shoes or

1279    sneakers drag in all the outside mud. So, the sauna has gone from being kind of nice

1280    to being kind of gross and creepy and VERY unhealthy. Defendants don't care if they

1281    are allegedly violating the local health code(s). And if you do not like it, you can go

1282    someplace else. Much of this complaint is about basic noncompliance with the laws of

1283    the State of Florida and the United States. Issues arising from common all due

1284    diligence. Simple things that take no real effort to maintain are ignored by this

1285    company. And if you don't like it, "tuff you don't like it." The cost involved in legal

1286    action is prohibitive and if local enforcement officials bring too much pressure to bear

1287    then there is the previously mentioned political action committees; will allegedly take

1288    Defendant(s)' money and fix the situation. The health club circuit inside the state of

1289    Florida has used its political clout to legislate away any possibility that someone is

1290    going to take them on in the state court and get away with it. Even the Florida State

1291    Supreme Court has decided the only lawful duty that a health club has in Florida is to

1292    dial 911 if somebody needs help or something bad happens;

1293        ... ***Limones v. Sch. Dist. of Lee Cnty.****161 So. 3d 384 (Fla. 2015)* *Cited 40 times*

1294        *Holding that because of the nature of a school's relationship to their juvenile*

1295        *students, a jury could find that the school breached its duty of care by not*

1296        *providing student athletes with defibrillators. Additionally, we reject the position*

1297        *of the Second District and Respondent that L.A. Fitness governs this case. The*

1298        *Fourth District in* **L.A. Fitness** *determined that the duty owed by a commercial*

1299        *health club to an adult customer only required employees of the club to*

1300        *reasonably summon emergency responders for a patron in cardiac distress.* 980

1301        So.2d at 562 ; see also De La Flor v. Ritz–Carlton Hotel Co., 930 F.Supp.2d 1325,

1302        1330 (S.D.Fla.2013) (citing L.A. Fitness, 980 So.2d at 562 )...;

1303

1304    ... Allegedly it is unknown if this ruling would survive a federal court review,

1305    incorporated entities that employ dangerous equipment for entertainment purposes are

1306    usually held to a hirer standard. No one is going to put this standard to a federal test

1307    because it is too expensive, and these companies bring in too much revenue for the

1308    state to make any changes at the political legislative level. Why do they get away with

1309    it? Allegedly, through those said PACs, if you cooperate with them; they will help pay

1310 for your next political campaign. Another example; it used to be the local club was
1311 open until midnight. Which was nice because the club sits alongside Conway Rd. @
1312 Michigan. Which is a main artery to and from the cargo areas at Orlando International
1313 Airport. If you work there, you could get off duty, you have enough time to spend 20
1314 minutes in the hot tub or do a 30-minute workout or sit in the sauna. Defendant(s) just
1315 arbitrarily cut that hour out. It did not matter that decision put them in Conversion of
1316 Service that everyone had already paid for; and was just arbitrarily taking it away. "If
1317 you don't like it, tuff you don't like it." This is why Plaintiff is respectfully suggesting
1318 to the court that companies like Defendant(s)' who have bad actors cannot be touched.
1319 If anyone tries to touch them, they use enormous assets and overwhelming resources
1320 and then proceed to prove that they cannot be touched. If plaintiff has met his proofs
1321 sufficiently to satisfy the court, then Plaintiff respectfully request, that when the court
1322 assesses what relief is appropriate; the larger reality presented here will be taken into
1323 consideration.

1324

1325 37.       (1.)     While there has been no recent employment Plaintiff, referencing
1326           previous day rates pre COVID.  Plaintiff's Media Production Day Rate for
1327           Orlando, Florida is $750/day; Tampa $1200/day; Miami $1700/day. With full
1328           considerations to Pain and Suffering, emotional duress, aggravating pre-existing
1329           condition(s), nerve damage to said burned areas; and what looks to be a
1330           permanent limitation in mobility referencing plaintiffs' inability to jog anymore;
1331           Plaintiff Respectfully Petitions for $675,000.00 in relief for Pain and Suffering.
1332           If the court finds that punitive damages are justified Plaintiff Respectfully
1333           Petitions for $675,000.00. As to the cost of research and writing this complaint
1334           Plaintiff request 21 days at his Orlando rate or 21x$750= $15,750.00; plus, all
1335           associate court costs.

1336           (2.)     On **Count 1:** Relief Plaintiff Respectfully Petitions, on the issue of
1337           said herein <u>culpable negligence</u>, failure to do all lawful duty with all due
1338           diligence, failure to train, failure to supervise and turning plaintiff into a victim

of crime plaintiff requests $15,000,000.00 actual damages. If the court find(s)punitive damage(s) are justified; Plaintiff request the same amount for punitive damages.

(3.)    On **Count 2:** Plaintiff Respectfully Petitions for said herein culpable negligence, failure to do all lawful duty with all due diligence, failure to train, failure to supervise and turning plaintiff into a victim of crime plaintiff requests $15,000,000.00 actual damages and if permitted by the court the same amount in punitive damages.

(4.)    On **Count 3:** Plaintiff Respectfully Petitions for;

**(A.)**

**February 9th, 2024**, notes: said event attached and incorporated herein as part of this complaint; Relief for said issue(s) of: 42 U.S.C.§1983, Privacy; and Fla.Stat.§877.03; Fla.Stat.§553.865 (6)(d): Penial Code Violation; $1,000,000.00 actual damages and if permitted by the court the same amount in punitive damages;

**(B.)**

**February 14th, 2024**, notes: said event attached and incorporated herein as part of this complaint; Relief for said issue(s) of: 42 U.S.C.§1983, Privacy; and Fla.Stat.§877.03; Fla.Stat.§553.865 (6)(d): Penial Code Violation; $1,000,000.00 actual damages and if permitted by the court the same amount in punitive damages;

**(C.)**

**March 13th, 2024**, notes: said event attached and incorporated herein as part of this complaint; Relief for said issue(s) of: 42 U.S.C.§1983, Privacy; and Fla.Stat.§877.03; Fla.Stat.§553.865 (6)(d): Penial Code Violation; $1,000,000.00 actual damages and if permitted by the court the same amount in punitive damages;

**(D.)**

| 1367 | **March 22nd**, **2024**, notes: said event attached and incorporated |
| 1368 | herein as part of this complaint; Relief for said issue(s) of: 42 <u>U.S.C</u>.§1983, |
| 1369 | Privacy; and <u>Fla.Stat.§877.03; Fla.Stat.§553.865 (6)(d)</u>: Penial Code Violation; |
| 1370 | $1,000,000.00 actual damages and if permitted by the court the same amount in |
| 1371 | punitive damages; |

**(E.)**

| 1373 | **July 29th**, **2024**, notes: <u>**After Enforcement date of July 1st 2024:**</u> |
| 1374 | <u>**Fla.Stat.§553.865:**</u> said event attached and incorporated herein as part of this |
| 1375 | complaint; Relief respectfully requested; on said issue(s) of: 42 <u>U.S.C</u>.§1983, |
| 1376 | Privacy; and <u>Fla.Stat.§877.03; Fla.Stat.§553.865 (6)(d)</u>: Penial Code Violation; |
| 1377 | $2,000,000.00 actual damages and if permitted by the court the same amount in |
| 1378 | punitive damages; |

**(F.)**

| 1381 | **August 3rd**, **2024**, notes: <u>**After Enforcement date of July 1st 2024:**</u> |
| 1382 | <u>**Fla.Stat.§553.865:**</u> said event attached and incorporated herein as part of this |
| 1383 | complaint; Relief respectfully requested; on said issue(s) of: 42 <u>U.S.C</u>.§1983, |
| 1384 | Privacy; and <u>Fla.Stat.§877.03; Fla.Stat.§553.865 (6)(d)</u>: Penial Code Violation; |
| 1385 | $2,000,000.00 actual damages and if permitted by the court the same amount in |
| 1386 | punitive damages; |

**(G.)**

| 1388 | **August 10th**, **2024**, notes: <u>**After Enforcement date of July 1st**</u> |
| 1389 | <u>**2024: Fla.Stat.§553.865:**</u> said event attached and incorporated herein as part of |
| 1390 | this complaint; Relief respectfully requested; on said issue(s) of: 42 |
| 1391 | <u>U.S.C</u>.§1983, Privacy; and <u>Fla.Stat.§877.03; Fla.Stat.§553.865 (6)(d)</u>: Penial |
| 1392 | Code Violation; $2,000,000.00 actual damages and if permitted by the court the |
| 1393 | same amount in punitive damages; |

**(H.)**

**August 24ᵗʰ, 2024**, notes: <u>**After Enforcement date of July 1ˢᵗ**</u> <u>**2024: Fla.Stat.§553.865:**</u> said event attached and incorporated herein as part of this complaint; Relief respectfully requested; on said issue(s) of: 42 U.S.C.§1983, Privacy; and <u>Fla.Stat.§877.03; Fla.Stat.§553.865 (6)(d)</u>: Penial Code Violation; $2,000,000.00 actual damages and if permitted by the court the same amount in punitive damages;

**(I.)**

Said Defendant(s) Actor(s) <u>"A THROUGH Z"</u> who are before the court as Individuals or Entities, Fitness International policy making Executive(s) unknown except by discovery; who aided and abetted, directed, failed to supervise, failed to properly train, failed to do all lawful diligence(s) and or are Identified herein as *Respondent(s) Superior(s)*: Relief respectfully requested; on said issue(s) of: 42 U.S.C.§1983, Privacy; and <u>Fla.Stat.§877.03; Fla.Stat.§553.865(6)(d); Fla.Stat.§ §784.05</u> (SEE: section(s) (13) (14) herein);

Penial Code Violation(s); Plaintiff respectfully petitions for $2,000,000.00 actual damages each, and on each count; and if permitted by the court the same amount in punitive damages for each *Respondent(s) Superior(s)*; Respectfully reminding the court that as detailed herein; said actor(s) behavior in this matter has been <u>habitually unlawful</u> for more than 10 years and certainly the last 5 years as eye witnessed testimony herein by Plaintiff and at trial Plaintiff intends to call many other eyewitnesses and this Complaint is taken against all Respondent(s) Superior(s) for good and lawful reason(s).

**CONCLUSION:**

38. Plaintiff respectfully requests the court observe all the simplicity that could have been involved in preventing all of what has happened listed herein this complaint. Plaintiff has visited some competing venues for LA Fitness in many different places across the country. It is very common to have either a chalkboard or grease board next

to the hot tub. Sometimes there is even a camera that can be monitored by computer focused only on the chalkboard aka, "update sign." All that is on this board is the date, the time, the temperature of the two pools, and the pH levels. (pH level of 7.2 to 7.8 is deemed normal) Often members view these signs as good customer service. That is not what they are for. What is posted is intended only as a technicality. They are used because in a complicated sometimes dangerous environment like a health club, any crowed health club anywhere; these boards provide a venue for all due diligence arising at law and safety. They are literally a tool for lawful compliance. They help create and maintain a "Safety Culture" among employees. If the boards are not updated every two hours, then the supervisors and managers take notice and start asking questions. Even the customers, the membership, will start to question why the pool board has not been updated. If the camera locked onto to the sign is part of the corporate network, then the regional and national supervisors/managers/executives can push a few buttons and see for themselves if the local club is doing all due diligence. That same computer system has "pool logging in-put" for updates daily data creating a history of lawful compliance. So, any manager can login and look back in its history. An extraordinarily simple device that delivers exceptional returns. Even though said signs are an industry standard, to the best of plaintiff's knowledge, one will not find them in any of the LA Fitness clubs in Florida. In a venue that can become very dangerous, like a health club, the rule of: safety comes first, should be enforced rigorously just to comply with the basic rule of law. Fitness International's alleged failure to create an active safety culture through training and strong consistent close supervision; negates the effect of safety first. This is entirely upon Defendant(s)' own incompetence and lack of management skills. Which is a big problem for some major corporations who promote salespeople from within. A successful salesperson does not denote an individual with effective management skills. Salesmanship is an art form for "BS-Artists" not a management skill and individuals who are intellectually challenged can still be very talented in sales. Continuing the point of simplicity, Plaintiff would ask the court to observe the lack of basic "knowing and willing compliance" with the laws

of the State of Florida and the United States. It requires no intellectual reach to do something as simple as keeping the female employee(s) out of the men's room and the male employee(s) of the women's room. It is reasonable to assess that doing so represents some measure of common community decency and a diligent way of compliance with said law(s) cited herein. Which should be basic common sense 1-0-1 for any executive creating policy for a multinational incorporation. For reasons unknown these basics are lost upon the salespeople running "Fitness International LLC, California." Plaintiff Encourages the court to make this case a wakeup-call. Plaintiff adds notes of 16 August 2024 [Att: NOTE(S) Page: 14] as an explanation or a firsthand witnessed scenario that unfolded before plaintiff on said date and time; between the hour of 7:40pm and 8:40pm. It is always unusual for the pool maintenance person to show up so late in the day. This one showed up with Color Coated Marked Hazardous materials carrying them openly. With the clear intent to pour the chemicals into the pools, and or, any devices whose purpose it is to feed the chemicals into the pools. The people behind the front desk were oblivious to what was going on and by the time Plaintiff made it out to the front desk, having showered and dressed, those people were gone. Where? The club closes at 9pm on Fridays and Plaintiff does not know. There are pictures from 8:40 PM, just one hour later, (from outside the club) no signs; no warnings; and no one at the desk. This company is void of any rational "reasonable person(s')" safety culture. The pictures were taken from outside and the man's face in the hot tub is blurred to protect his privacy. This represents the most likely real-world, real-time scenario, and is most likely what happened to this Plaintiff. He arrived shortly after a maintenance cycle for the pool and the hot tub and there were no warnings because there is no safety culture of any kind. Respectfully, the court should show no sympathy or tolerance for this level of incompetence. If it does it will just happen again and again until the plaintiff before a sometime in the future court is a mother and her teenage child.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable;

I do affirm and declare under penalty of perjury that the foregoing is true and correct without exception.

Respectfully Submitted,

9 September 2024

Andrew James Ensor, Per se

CIVIL ACTION COMPLAINT

CASE No _____